Good morning, your honors, and may it please the court, Brianna Mircheff on behalf of Nna Onuoha. Your honors, this case requires this court to examine whether the government has presented a substantial interest that would warrant subjecting an unwilling patient to powerful psychotropic medications. A cell order is a disfavored intervention, and yet the reasoning of the district court here threatens to make cell a far too commonplace arrangement, and does so based on a substantial and unwarranted extension of Gil and Water. For that reason, we're asking that the court would vacate the district court's order authorizing medication. Your honors, I plan to address the two prongs in the order that they appear in the brief, and so I'll start with prong one, which is, of course, whether the government has an important interest in medication in this case. And in a lot of ways, I think the government and the defendant agree that this comes down to how this court views this court's prior decision in Gil and Water. We believe that Gil and Water was an extraordinary case with extraordinary facts, a case where the defendant caused extraordinary trauma by launching lurid and distressing threats, escalating in volume and violence, demonstrated, as the district court found in that case, an ability and an intent to carry out those threats, and resisted law enforcement efforts over the course of a year to get him to stop. Limited to that set of facts, Gil and Water is certainly within the constellation of this court's prior case law. But this case would call for a significant extension of Gil and Water, because it stands on both factual and legally different footing. Here we have a man who delusionally believed that his actions were the best way to spread his religious message, and yet, as the district court found, those threats were far less violent than the statements in Gil and Water, who, unlike Gil and Water, had neither the plans nor the ability to do actual violence in this case, and who actually caused administrative inconvenience, a fact that's fully accounted for in the guidelines. Legally, this case stands on different footing as well. Here we have a case where... Relative guideline range is comparable. I'm sorry? Where the relative guideline range is comparable in Gil and Water in this case. There's a six-month difference. The Gil and Water guideline was 33 to 41 months. The guideline here is 27 to 33 months. So when we're talking about guideline ranges that low, that is a 20% difference. The other, I think, relevant fact about the guideline difference in Gil and Water is that it seemed clear to the panel in Gil and Water that there was a significant chance that that defendant was not going to get a guideline sentence. That's why it spent time discussing what the stacked statutory maximums would be if you pled guilty or were found guilty on all of the counts. Here we have a case where even the government, when it was arguing to the district court, said, we don't think this is a case where the defendant needs to do a significant additional amount of time. And so I think the government can't fall back on that argument, as it did in Gil and Water, that what we really consider is the 45-year statutory maximum in this case. Really, I think this is a case where the guidelines do account for the most aggravating facts. And I just don't think that was true in Gil and Water. I think in Gil and Water, I think there was a significant chance that that panel thought he was going to get an above-guideline sentence. Counsel, I'd like to interject a question, please. Yes. So this case involves, at least from the government's perspective, what they perceive as a bomb threat at LAX that could close down a terminal and that did, in fact, close down the Homeland Security Office. So in considering the first factor that we looked at, what the government's interest is, why should we not think that the government has a very strong interest in prosecuting and getting a ruling whether there's guilt on a bomb threat at LAX? I guess there's a number of reasons why I think this case, and I certainly don't mean to say it's not important in a lay sense of the word, but I assume the government doesn't prosecute any case unless they think they have some important interest. All right. But they have prosecutorial discretion. And if they think they have an interest in this, you know, why shouldn't we credit that for purposes of that test? I have some problem with the other factors as to whether the medications in this guy's best interest and some other things, but just as to what the government's interest is, it's hard for me as one judge to think that I could say they don't have an interest here. I think what's important here is what the court has always said is the touchstone of the importance is the guideline range because that's a proxy for the seriousness of the offense. That's an objective proxy. Here we have a case where the defendant has already served, as of this week, the full guideline without acceptance, without credit for the time he served, without credit for good time. He served a 27-month guideline sentence in this case. And because that's the touchstone of the analysis, I think it can't be brushed aside. Beyond that, I think it has to be said that regardless of what the perceived threat was on that day, what we actually have here is a case where the defendant did not have any ability or intent to carry out an act of violence. And I think that's relevant. But taking Your Honor's cue, I will address certainly from... He didn't intend to clear out LAX, even though he didn't succeed in doing that. Agreed, Your Honor. He had the intent, but I guess what I'm saying is he had that intent. He didn't have the intent to do what the authorities believed he had the intent to do. I understand that, but it's still having the intent to completely disrupt the airport for some period of time is... Anyway, go ahead. I believe he did. I mean, I think he had the intent to clear the airport. It was not successful. And when the dust settled, this was a person who had neither the ability or the intent to carry out an act of violence. On the fourth prong, the question shifts from the legal interest to the medical interest, right, from the defendant as a criminal defendant to Mr. Anoha as a patient. And we've raised several concerns in our brief. One is that the district court's order authorizes a form of Heldell that contravenes the psychiatric authorities in this area. What the government's own expert admitted was the community standard of care. It used a dosage that's excessive by those same psychiatric authorities. It's considered high under the drug manufacturer's guidance, high under the BOP's internal guidance. It's one that one of the two government experts said was higher than he thought was necessary to the case. And it's a treatment plan that the government's expert admitted was a somewhat cookie-cutter plan, even though at the same time he was admitting that dosing is a highly individualistic exercise. All of those should have been significant red flags to the district court. It should be significant red flags to this court in affirming the district court's order. The government says, well, you know, we should trust Dr. Lucking. He's done this a lot. This court's public decisions in the cell area over and over again say that the district court has to make detailed medical findings. This is not something that can be simply delegated to the BOP. Can I have a question on that? Certainly. Did the district court make any findings that addressed what the BOP's own regulations or guidelines said about dosage on this drug? I guess giving the district court the benefit of the doubt, it found Dr. Lucking to be credible. It did not, however, address the specific question related to dosage or the question about the form of the medication. Neither one of those were discussed in the order specifically, even though they were brought up at the argument. And I'm down to about a minute and a half. If there aren't pressing questions, I'd like to reserve the balance of my time. Good morning. May it please the court. My name is Melissa Mills, and I represent the United States in this case. This case presents the rare circumstance where the defendant's interests and the government's interests are squarely aligned. On the government side, the government has an important interest in prosecuting the defendant for his serious crimes in engaging in a course of conduct conveyed. What is the reason that there's a serious interest in prosecuting him now? Do you think he may get a longer sentence than the amount of time he will have served before he's convicted, including the psychiatric commitment time? Or there's some suggestion that there are other considerations which the defendant attempts to debunk with regard to ownership of guns and supervision and so on. What are the reasons why there's an interest in conviction at this point? Yes, Your Honor. I think the government has a number of interests. Most important, I think, as in Gillenwater, the government's important interest here is primarily rooted in supervision of this individual, in monitoring and ensuring that... I'm sorry, in what? In supervision, Your Honor, in monitoring and ensuring that he receives medical treatment, ensuring that this person who has proven himself to be a threat to public safety is not simply turned out onto the street unmedicated. A supervised release, essentially. That's essentially it, Your Honor. Of course, general deterrence is also a factor. I said it before the district court. I'll say it here as well. General deterrence meaning that somebody's going to think, well, this guy wasn't actually sentenced even though he was, in fact, in jail for that... or confined for the same period of time anyway? That he wasn't convicted, Your Honor. That is not the primary interest. I'm just saying, in general, that is an interest. I think the primary interest here is really rooted in supervision, and the defense calls that into question in its reply brief, that that's really a legitimate interest, and essentially asks this court to overrule Gillenwater on that point, that supervision is not a legitimate interest in and of itself. I think Gillenwater is quite clear on that point, and I think that this court should abide by that established precedent. Counsel, Judge Gould, if I could interject. Is it your position that the findings of fact that the district court made about the nature of the medication and the interest of Mr. Onoha in having that medication and the dosage and all the related details are adequate? Yes, Your Honor, I do believe they are adequate. I think it's important to note that in this case, the district court was heavily involved, basically conducted two very extensive evidentiary hearings, was extremely involved in the questioning of those experts, demonstrated a facility with the record and the facts and the medical literature, and then after reading all of the briefs and hearing the evidence from both parties and the arguments from both parties, authored an exhaustive 20-page written opinion that did address all of the points that were raised by the parties. Well, the district judge said that the dosage levels proposed by the government is considered in the low range in which side effects are less frequent and severe. Is that correct? That is correct, Your Honor, and that is what the evidence shows. I thought that's what the dispute is here. I thought that the dispute was it's not in the low range. It's, in fact, higher than either BLP or the American Psychiatric Association or the manufacturer indicates. I believe that's a dispute that the defense is intending to create, Your Honor. The evidence below shows the only evidence, the uncontradicted evidence, shows this is a low dose. The government's experts indicated this is a low dose. It's considered to be a low dose that is not likely to bring on significant side effects. There was evidence. A low dose compared to what? I'm sorry, Your Honor? Low compared to what? Compared to a higher dose that would be likely to produce significant side effects. I'm confused. So the BLP guidelines are not considerably lower? That's not true? The BLP guidelines, Your Honor, they were introduced by the government and basically the BLP guidelines are intended, as the government expert explained, they're intended for a community setting. For what? They're intended for a voluntary community setting. They're not geared towards this particular circumstance. So the dosages here are not significantly higher than the BLP guidelines. They are on the high end of the BLP guidelines. But when the experts talked about a high dose that's likely to produce side effects or significant side effects, the experts were talking about doses of 20, 30, 40 milligrams, which is significantly higher than the 5 to 10 milligram doses suggested here. Did the district court findings address what you just said? I would have to review the district court's holdings, Your Honor. I know that the district court considered that evidence and found, I believe they quoted Dr. Lucking, the government's expert, in finding this to be a low dose and unlikely to produce significant side effects. Did the district court address whether this dose was at the high end of the scale recommended figure given by BLP? I don't think that it did, Your Honor, and I don't think that it needed to because the government's evidence showed, and it was not rebutted by any defense evidence, that those guidelines are, again, they're merely guidelines and they are intended for the voluntary community setting. They are not geared towards the cell context. If I understood what you said, then the community setting would be the dosage that is in the medical interests of the defendant. The higher dosage was, if I understood it correctly, geared to restoring competence to the defendant. So wouldn't the community setting dosage be the appropriate one if we're focusing on his medical interests? Your Honor, the point about the community setting dose is that they have a longer time period. The evidence showed very clearly that the dose suggested here, which is at the higher end of the guidelines, again, not significantly above the guidelines, but at the higher end of the guidelines, is not dangerous. Both government experts who have a cumulative 40 years of experience with BLP indicated that this is not a dangerous dose. This has been used repeatedly for decades without any ill effect, and that was not controverted by the defense. That is the uncontradicted record in this case. Was there some suggestion to draw further on what Judge Dee was suggesting, that the reason for the choice of dose was partly the speed with which he would be restored? Well, Your Honor, I think that is a practical consideration given the four-month statutory limit on restoration. It shouldn't be under the fourth prong, should it? Well, Your Honor, I think that to the extent that it can be done under the fourth prong safely and in the best medical interest of the defendant, I think that it's not an unfair consideration to take. And the evidence shows that it is not dangerous. It is not unsafe. It is, in fact, very safe and very effective at the dosages that are recommended here, which are the same dosage that have been used repeatedly by BOP for many decades. With respect to the fourth cell factor, I think it's important to note that this illness prevents the defendant from recognizing that he has an illness. And he is not refusing medication because he's afraid of the side effects. He's refusing medication because he does not believe that he is ill. This defendant has never had a clear-headed opportunity to make a decision, a reasoned determination, as to whether the medication is worth it to him or not, as to whether he wants to spend the rest of his life in the shadows fighting schizophrenia without any medical treatment, or whether he wants to regain his functionality, his very high-level functionality that he enjoyed. This is a person who had a good government job, a federal job. He had good government housing or subsidized VA housing. He had good relationships, stable relationships. He had hobbies. He had a full life. But nothing in this, I mean, I think the district judge recognized and the doctor recognized that this is all short-term repair. I mean, I guess there's some notion that if he's better for a short while, he will realize what his interests are and commit to some longer-term therapy. Is that the idea? And that's exactly what the evidence shows, Your Honor, that if his delusions are decreased, which this medication is likely to do, when his delusions are decreased, he'll have the opportunity to make that decision for himself as to whether he wants to continue with medication or whether he doesn't. The defense makes an argument that the discontinuation rate, which I believe they misquote the rate as being higher than it actually is, and I would ask the court to review that site, but they cite that as being 60% to 80% in the literature. That literature does not actually refer to this particular drug. But in any event, all antipsychotic medications do have a high rate of discontinuation. That is not a reason that they are medically inappropriate. That argument would apply equally to any other individual, and it would never be prescribed if that were the case. Was there any evidence comparing the Halperidol to other more recently developed psychotropic drugs that might be more expensive but also more effective and less likely to cause severe side effects? Yes, Your Honor, and this is not a question of expense. There's no indication in the record, there's no evidence whatsoever, that this is a cost-driven decision. The reason why Halperidol was prescribed here is because the second-generation antipsychotics, the risperidone and other drugs, cannot be safely given to a patient who hasn't previously been dosed with these medications because they're not available in the proper test dose. So that's another thing that if the defendant takes this medication, it restores some level of functioning, and then decides to take medication voluntarily, the options open up quite a bit as far as what he could be taking and those second-generation medications become available. Okay, thank you very much. Thank you, Your Honor. Very briefly, I want to touch on a few of the dosage issues. The PDR, the physician's desk reference, says the starting dose should be 2 to 5 milligrams. That's at excerpts of record 388. Here they recommend a dose of 10 milligrams, which is more than double, or I guess double the rate recommended by the physician's desk reference. When you take, and Dr. Lucking said this, when you take the recommended dosage and convert it to a dosage of Haldol, Decanoate, the recommended dosage would be 10 to 90 milligrams. That's at excerpts of record 803. That's significantly less than what the recommended dose, or what the dose Dr. Lucking would have for this case, which is 150. The district court did not, he thought otherwise. Was he just clearly erroneous? My understanding is the district judge said that if you convert the long-term amount to a daily amount, that it's considerably below the recommended dose. I think the district court is wrong here. Dr. Lucking said that if you converted it, that the dosage recommended by the physician's desk reference would be 10 to 90 milligrams. And again, here we're talking about 150 milligrams. No, but on a daily basis. And that was, you know, at some point Dr. Lucking talked about what the dosage was simply divided by 30, right? Which is not how this works, right? There's a conversion factor between the two drugs that says you multiply it by 10 to 15. And so that made the numbers come out differently. But I think at the second hearing, he acknowledged that the physician's desk reference was lower. And I think going back to something you said, you know, it was clear that both of the doctors were talking about worrying about the timeframe. We have to hurry this up because we only have a certain amount of time. And as you said, that's not the community standard of care. The community standard of care is that you do the dosage that's safest. So it's my understanding that your objection is not to whether, on this ground, whether he gets psychotropic medication or even this psychotropic medication, but the dosage. We raised a question about the dosage. We raised a question about the long-acting versus short-acting. We did raise a question about whether it could be said to be in Mr. Onoha's medical interest at all, given the high rates of discontinuation of all drugs. And so merely to prop him up for a short time for trial served the legal interest, but not his medical interest. Okay, thank you both. I want to say that this will help one of the best briefed and argued cases in a fairly routine case that I've seen in a long time. So thank you both. Thank you. The case of Onoha, United Services versus Onoha is submitted, and we will take a short break. Thank you.
judges: Gould, Berzon, Steeh